No. 63,120

WICHITA FEDERAL SAVINGS AND LOAN ASSOCIATION, *Appellee/Cross-Appellant,* v. GALE D. BLACK, *Appellant/Cross-Appellee.*

(781 P.2d 707)

Opinion filed October 27, 1989.

*Clifford L. Malone*, of Adams, Jones, Robinson and Malone, Chartered, of Wichita, argued the cause, and *Larry D. Spurgeon*, of the same firm, was with him on the briefs for appellant.

*Alexander B. Mitchell II*, of Klenda, Mitchell, Austerman & Zuercher, of Wichita, argued the cause, and *John B. Gilliam*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

E. NEWTON VICKERS, District Judge, Assigned: Gale Black, the former President and Chairman of the Board of Wichita Federal Savings and Loan Association (Wichita Federal), appeals from a $17,537,185.75 judgment against him for his negligence in financial futures trading on behalf of Wichita Federal. Wichita Federal cross-appeals the district court's denial of prejudgment interest on the damages.

Facts

Gale Black began working for Wichita Federal as a teller in 1947 and over the next thirty years rose to the position of President and Chairman of the Board of Directors of Wichita Federal. At all times herein Black was responsible for the managing of investments for Wichita Federal. As a federally char-

tered savings and loan association insured by the Federal Savings and Loan Insurance Corporation (FSLIC), Wichita Federal was subject to supervision and regulation by the Federal Home Loan Bank Board (the Bank).

In October 1984, the Bank initiated an examination of Wichita Federal. A formal report of the examination was sent to Wichita Federal in January 1985. The report was not favorable and made a number of criticisms. The report revolved around the fact that Black had been investing Wichita Federal funds in speculative reverse-repurchase agreements. The report was also critical of the fact that Black was the only person making investment decisions and accounting for them and that Wichita Federal had no written business plan to meet interest rate risks.

The savings and loan industry had been a fairly profitable industry until the late 1970s. Up until that time, savings and loan institutions made their profits by charging slightly higher interest on long-term mortgages than the interest paid to depositors. In the late 1970s, interest rates soared, resulting in higher interest having to be paid on deposits while the interest on most long-term mortgages remained fixed. This result is referred to as "interest rate risk."

Defendant Black was able to offset losses paid to depositors as a result of high interest rates by investing in reverse-repurchase agreements. On February 8, 1985, Anne McDonley, financial futures specialist for the Bank, wrote to the Board of Directors of Wichita Federal and made certain recommendations. She directed it to compile a formal business plan, identifying goals and objectives and outlining strategies to improve the operations of the association. She said an investment policy should be developed, with particular emphasis on interest rate risk. The letter also stated:

"As a result of the potential risk your association faces, you are directed to cease your present activity of speculating with dollar roll reverse-repurchase agreements until such time a formal business plan is developed and submitted to this office. Prudent management also dictates the use of other methods to facilitate the restructuring of your association's balance sheet that are less risky. *Some form of a hedging strategy is also a necessity to offset interest rate risk.*" (Emphasis added.)

Upon oral deposition, McDonley gave a definition of "hedging" as:

"trying to immunize yourself against interest rate risks. As rates go up, you're concerned that the value of your portfolio will go down, so by putting on a financial futures contract you're protected because you're taking an equal but opposite position in the market so that if you're losing money in the cash markets, you should be gaining money in the futures market, or vice versa, so you end up with a balance of a net zero position."

The Board of Directors of Wichita Federal met on February 15, 1985, at which time it discussed the Bank's examination and recommendations. Black presented an outline of a business plan for Wichita Federal which was tentatively approved subject to review of the final plan itself. According to the minutes of the February 15 meeting, the Board unanimously authorized Black to engage in the trading of financial futures and also authorized Black to conduct business with certain securities brokerage firms. On February 19, 1985, Black informed the Bank that the Board had authorized him to engage in futures and options transactions.

Black implemented a "hedging" program with Shearson/American Express, Inc., to offset the interest rate risk created by reverse-repurchase agreements. On February 27, 1985, Black sold short 1,930 June treasury bond contracts. Black closed the transactions on March 1, 1985, and realized a profit of $416,709.60, which profit he did not report to the Board of Directors or mention in the monthly report.

On March 25, 1985, Black sold short 1,950 June treasury bonds through Landmark Securities Corporation (Landmark) to Iowa Grain Company and on May 28, 1985, he closed his position on the June treasury bonds and opened a new position on 1,950 September treasury bond contracts. On June 21, 1985, Black closed the short sale of the treasury bond contracts, which resulted in a loss from March 25 to June 21, 1985, of $17,537,185.75. This amount exceeded the net worth of Wichita Federal.

Wichita Federal's Audit Committee and Board of Directors met with Black during the month of March 1985. At the Audit Committee meeting, it was recommended that there should be a segregation of duties so that no one individual had sole and exclusive control over executing and recording transactions. Further, it was stressed that there be a formal asset-liability management plan to reduce exposure to interest rate risks. Neither at the March Audit Committee meeting or the meeting of the

Board of Directors did Black disclose that he had made a profit of $416,709.60 selling short June treasury bonds.

The Bank also initiated a special examination of Wichita Federal on March 11 to see if McDonley's directives of February 8, 1985, had been carried out. The special examination of Wichita Federal found that three regulatory violations had taken place: (1) There was no written financial futures policy; (2) the Board of Directors had not given Black the authority, at least in writing, to engage in futures transactions; and (3) the Board of Directors had not set forth Black's duties and responsibilities and limits in the futures area. See 12 C.F.R. § 563.17-4(d), (e) (1989).

On April 15 the Board of Directors met in Wichita and on April 16 the Board met in Topeka with representatives of the Bank to execute a supervisory agreement between Wichita Federal and the Federal Home Loan Bank Board. The latter meeting was held so that the Board of Directors of Wichita Federal could avoid the initiation of enforcement proceedings for violations of laws and regulations and for unsafe practices. The agreement provided that Wichita Federal would immediately implement a comprehensive written business plan, including policies for investment and interest rate risks. Also, the plan would address financial futures and/or options as a hedging vehicle with detailed requirements as to hedging strategy and implementation.

The Board of Directors of Wichita Federal met on May 20, 1985, and met again on June 17, 1985, when representatives of Landmark gave a brief presentation on hedging. Another Board meeting was held on July 15, 1985. Black made no report of his activities in the financial futures market to the Board at any of the aforementioned meetings. This was the case even though on June 21, 1985, he had sustained a loss of $17,537,185.75.

At none of the many meetings chronicled herein did Black report to the Board of Directors as to his dealings in financial futures, nor did he comply with any of the regulations of the Bank regarding implementation of a hedging program. At trial, evidence revealed that Black did not include his dealings in financial futures in monthly reports to the Bank. On July 18, 1985, at a luncheon meeting, Black reported to Dean Frankenbery, manager of Wichita Federal's accounting department, that he had lost $17.5 million.

On July 22, 1985, a special examination into Wichita Federal's solvency and financial futures activity was initiated by the Bank.

The issue of whether the transactions with Landmark were an appropriate hedge was the subject of the investigation by McDonley of the Bank. If the hedge was found to be appropriate, Wichita Federal could defer the loss and remain solvent; if not, it would be insolvent and subject to receivership. In a September 26, 1985, letter to Wichita Federal, McDonley found that the strategy involved could not be duplicated but found the "hedge," which was approximately 80% effective, was sufficient to allow loss deferral pursuant to regulatory accounting principles. McDonley was highly critical of the manner in which the transactions were undertaken, testifying as follows:

"[T]here was no way for me to determine whether this analysis had actually been done at the time the hedge was put on or had been done just at my request at the end, so these numbers are all suspect, and the entire efficiency ratio rides on what you come up with for the value of the portfolio. The value of the loss in the futures contract is given, but the value of the portfolio is the key number. If it had been lower or higher, this number would have changed dramatically."

McDonley further stated:

"It was my opinion that they were lucky to come up with that because there were so many things working against this hedge, so much information missing, no way to go back and duplicate what the hedge ratio should have been, that they were just lucky to have gotten that number."

As a result of the investigation, the Bank recommended that Black be removed from office.

After the September 26, 1985, letter to Wichita Federal from McDonley, an independent audit of Wichita Federal was conducted for the fiscal year and it was concluded that $10,189,941 of the loss could be deferred, but the remainder had to be written off as a loss for that year. The Bank and Wichita Federal concurred in this conclusion.

A tax return was filed for Wichita Federal on July 21, 1986, and, in that return, Wichita Federal claimed the $17.1 million (the net of the February-March and March-June transactions) future loss as "hedge loss mortgage loans." By representing such as a hedge loss, it was able to deduct the same as an ordinary loss, resulting in tax benefits of approximately $7.3 million.

On December 5, 1986, Wichita Federal filed this action against Black, alleging that he was negligent in the handling of Wichita Federal's money in that he invested in financial futures in violation of applicable federal rules and regulations and exceeded his authority in doing so. The case was tried to the

district court in August 1988. On September 23, 1988, the district court filed 100 findings of fact and 16 conclusions of law and entered judgment against defendant Black for $17,537,185.75. The district court concluded that Black was negligent and was liable to Wichita Federal for the full amount of the loss. Black filed a timely notice of appeal, and Wichita Federal filed a notice of cross-appeal after the district court denied it prejudgment interest.

Black contends that the trial court erred when it found that his investment in financial futures, although intended to be hedging strategy by Black, was negligently carried out, resulting in speculation and damage to Wichita Federal. Black contends that if, under the evidence, this court finds Black's investment activities to be a "hedge," the trial court must be reversed.

Wichita Federal, on the other hand, contends that "hedge" versus "speculation" is not the issue, but rather the issue is whether Black, under the evidence, was guilty of negligence in his trading in financial futures. Further, were such dealings authorized and what were the damages?

We agree with Wichita Federal that "hedge" versus "speculation" is an oversimplification and a non-issue in this case. The trial court in over 100 findings of fact and conclusions of law found that Black was so negligent in his trading in financial futures that, even though he intended a "hedge," his trading was without authority and so flawed in planning and execution that it amounted to "speculation" with Wichita Federal's funds, resulting in a financial loss of $17,537,185.75.

## Were the trial court's findings that Black's trading in financial futures was unauthorized and negligent clearly erroneous?

"Negligence is a question of fact. [Citations omitted.] Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. [Citation omitted.] In a negligence case, the plaintiff must establish a duty of reasonable care owed by the defendant to the plaintiff, a breach of that duty, damage to plaintiff, and a causal connection between the duty breached and the damage sustained. [Citation omitted.]" *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 244-45, 736 P.2d 882 (1987).

Since negligence is a question of fact, the scope of appellate review is clear:

"Where the trial court has made findings of fact and conclusions of law, the

function of this court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. [Citations omitted.] Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.] Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]

"Additionally, an appellate court must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the trial court, and must disregard any conflicting evidence or other inferences which might be drawn therefrom. [Citations omitted.]" *Leeper,* 241 Kan. at 243-44.

The common-law rule of liability of an agent for violations of his authority or neglect of his duty to the detriment of his principal extends to directors or officers for damages caused by negligent or unauthorized acts. 18B Am. Jur. 2d, Corporations § 1700, p. 552. Kansas has traditionally imposed a stricter duty on officers and directors than have many other jurisdictions. *Newton v. Hornblower, Inc.,* 224 Kan. 506, 514, 582 P.2d 1136 (1978). In *Federal Savings & Loan Ins. Corp. v. Huff,* 237 Kan. 873, 881, 704 P.2d 372 (1985), this court commented on the standards of duty for savings and loan officers:

"The potentiality for harm to Kansas citizens from mismanagement of savings and loan associations is enormous. A large percentage of their investors place their life savings in such institutions, relying upon the officers of such institutions to discharge their duties properly. When a savings and loan association fails the domino effect can be staggering. Public confidence in all savings and loans is shaken. Declining deposits in savings and loan associations have a direct effect on the construction, sale, and resale of homes, which in turn affects many other areas of our economy."

Regardless of whether the transactions at issue were intended as a hedge or speculation, the record is replete with evidence indicating Black's negligence in engaging in these transactions. Black does not even argue that he did not have a duty of reasonable care in his dealings on behalf of Wichita Federal, nor does he argue that he did not breach that duty. Instead, he argues that the trial court erred in finding that the transactions were speculation instead of a hedge. "The reasons given by the district court for its decision are immaterial so long as its ruling was correct for any reason." *Prairie State Bank v. Hoefgen,* 245 Kan. 236, Syl. ¶ 3, 777 P.2d 811 (1989).

There was some conflicting testimony as to whether Black

informed the other directors of Wichita Federal and employees of the Bank about his transactions through Landmark. The trial court, however, obviously found that the testimony indicating Black had not kept the directors and the Bank informed was more credible than Black's testimony. "[I]t is not the function of this court to weigh the evidence or pass on the credibility of the witnesses." *Tetuan v. A. H. Robins Co.*, 241 Kan. 441, 461, 738 P.2d 1210 (1987).

The trading of financial futures by federally insured savings and loan associations is governed by 12 C.F.R. § 563.17-4. Black failed to meet a number of the requirements of this regulation. 12 C.F.R. § 563.17-4(d) provides:

"Prior to engaging in financial futures transactions, an institution's board of directors must authorize such activity. In authorizing futures trading, the board of directors shall consider any plan to engage in financial futures transactions, shall endorse specific written policies, and shall require the establishment of internal control procedures. Policy objectives must be specific enough to outline permissible contract strategies, taking into account price and yield correlations between assets or liabilities and the financial futures contracts with which they are matched; the relationship of the strategies to the institution's operations; and how such strategies reduce the institution's net interest-rate risk exposure. Internal control procedures shall include, at a minimum, periodic reports to management, segregation of duties and internal review procedures. In addition, the minutes of the meeting of the board of directors shall set forth limits applicable to futures transactions, identify personnel authorized to engage in futures transactions, and set forth the duties, responsibilities and limits of authority of such personnel. The board of directors shall review the position limit, all outstanding contract positions, and the unrealized gains or losses on those positions at each regular meeting of the board."

12 C.F.R. § 563.17-4(3) provides:

"An institution engaging in financial futures transactions shall notify the District Director-Examinations of the Federal Home Loan Bank District in which it is located that it is engaging in such transactions. The institution shall report its gross outstanding long and short financial futures positions on the Federal Home Loan Bank Board Monthly Report."

12 C.F.R. § 563.17-4(f) recites the applicable record-keeping requirements for an institution engaging in financial futures transactions. It is clear from the record that Black did not comply with any of these requirements. The trial court's finding of negligence was supported by substantial competent evidence.

Was Black's negligence the proximate cause of Wichita Federal's damages?

Black argues that Wichita Federal did not establish a causal connection between his negligent trading and the damages incurred. Although the trial court did not originally make a specific finding on the issue of causation, it did address the issue in ruling on Black's motion to amend findings of fact and conclusions of law. "[W]hether there is a causal connection between the breached duty and the injuries sustained is . . . a question of fact." *Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86 (1983).

Black argues there was no evidence indicating that, if he had received the proper authority from the Board and the Bank, the outcome would have been any different. In other words, Black argues that his failure to inform the Board or the Bank is not the proximate cause of Wichita Federal's loss.

At trial, Douglas Pittman, supervisory agent and assistant vice-president of the Federal Home Loan Bank Board, testified as follows:

"Q. If Wichita Federal Savings had submitted a plan to your office to sell Treasury Bond contracts short against this loan portfolio, would that have been approved?

"A. Not unless there was identified intent those loans were to be sold because without that intent there would be no economic justification to enter into the contracts to hedge the fixed-loan portfolio."

The evidence was uncontroverted that Wichita Federal had no intention of selling its fixed-rate loan portfolio. Pittman testified that he would not have approved the plan.

Black cites *Karlen v. Ray E. Friedman & Co. Commodities,* 688 F.2d 1193, 1205 (8th Cir. 1982). In that case, Karlen was a customer who sued his broker for losses incurred when the broker made unauthorized transactions on Karlen's accounts. The court held there was no evidence that would have enabled the jury to determine that the losses would not have occurred but for the broker's unauthorized trading. In the case at bar, there is no doubt that the $17.5 million loss was a result of Black's unauthorized trading. The evidence indicates that, if Black had complied with the appropriate regulations and directives from the Bank, the trading would never have occurred because the Bank would not have approved it.

Black's negligent trading in financial futures was the "cause which in natural and continuous sequence, unbroken by any efficient intervening cause," produced the injury to Wichita

Federal. See *State Farm Mutual Automobile Ins. Co. v. Cromwell,* 187 Kan. 573, 576, 358 P.2d 761 (1961).

### Can the plaintiff collaterally attack the
### Federal Home Loan Bank Board's determination
### that the transaction was a hedge?

Black argues that, because Wichita Federal acquiesced in the Bank's finding that the transactions were a proper hedge, subject to deferral accounting, it is now estopped from claiming that the transactions were speculation. In *Newton v. Hornblower, Inc.,* 224 Kan. at 515, this court said:

"The party raising the defense of estoppel is himself bound to exercise good faith in the transaction. [Citation omitted.] Thus, a party may not properly base a claim of estoppel in his favor on his own wrongful act or dereliction of duty, or fraud committed or participated in by him, or acts or omissions induced by his own conduct, concealment or representations."

The trial court made the following finding of fact:

"97. Nelson and bank initially concluded that a portion of this loss was the result of a 'hedge,' and plaintiff filed its tax return claiming all of the loss as a result of a 'hedge.' Defendant claims that plaintiff is estopped to claim it wasn't a hedge. Defendant was not harmed by these factors and did not rely on his detriment upon them. Indeed, it was defendant who persuaded the auditors and bank that a hedge was intended. Had he not been so persuasive, plaintiff would have been insolvent and plaintiff in this case could have well been FSLIC. Nelson testified that had he known at the time of the audit that the transaction was designated as a 'hedge' after the fact, he would not have certified that any portion of this loss could be deferred. . . . Both Nelson and the bank relied upon the representations of defendant and Kane as to intent, and upon plaintiff's Exhibit 40A for justification for the number of contracts. Neither of those representations nor plaintiff's Exhibit 40A are reliable."

Pittman testified that, in making a determination as to whether the transactions met the appropriate standards for deferral accounting, the Bank need not consider whether there was sufficient authorization for the transactions or whether the transactions had a legitimate business purpose. Pittman testified that, even if Wichita Federal were to recover the losses from Black, the deferral would still be allowed.

Black does not argue that the Bank's treatment of the transactions as a hedge precludes a finding that Black was negligent. Black emphasizes that Wichita Federal accepted the "benefits" of the deferral accounting. At page 25 of his brief, Black says, "One of the benefits to plaintiff from the use of deferral ac-

counting was to avoid the showing of negative net worth and possible liquidation." Naturally, Black fails to mention that, but for his negligent transactions in financial futures, Wichita Federal would not have been put in the position of negative net worth and possible liquidation. Black has cited a number of cases in support of his estoppel argument. *F. P. C. v. Colorado Interstate Gas Co.*, 348 U.S. 492, 99 L. Ed. 583, 75 S. Ct. 467 (1955), was an appeal of a rate reduction order of the Federal Power Commission. There, the Supreme Court held that the Court of Appeals could not consider an objection which had not been raised before the Commission in an application for rehearing, nor could the Court of Appeals invalidate the reduction order where the gas company had acquiesced in the order as a condition of allowing a merger. The case at bar is not an appeal of the Bank's determination that Black's transactions were a hedge, but is a state law negligence action against Black.

*Kaneb Services v. Federal Sav. & Loan Ins.*, 650 F.2d 78 (5th Cir. 1981), was also a direct challenge of an administrative order. In *Kaneb*, the FSLIC had allowed Kaneb to acquire a savings and loan holding company on the condition that the amount of dividends paid out by one of the savings and loans acquired would be restricted. In holding that Kaneb was estopped from challenging the dividend restriction, the Court of Appeals said, "[A] party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." 650 F.2d at 81. Black does not explain how Wichita Federal, by trying to recover their losses from Black, is avoiding the corresponding obligations or effects. If Wichita Federal recovers from Black, it will have to claim the recovery as an ordinary gain and will be appropriately taxed for such a gain pursuant to 26 C.F.R. § 1.165-1(d)(2)(iii) (1989).

Another distinguishing factor of *Colorado Interstate Gas Co.* and *Kaneb* is that both involved official orders of an administrative agency. In the case at bar, the Bank made its determination that the transactions could qualify as a hedge for purposes of deferral in the course of its investigation into the solvency of Wichita Federal. The Bank also determined that Black's trading was unauthorized and was an unsafe and unsound practice.

The issue of collateral estoppel in relation to administrative actions was discussed in *Nasem v. Brown*, 595 F.2d 801 (D.C. Cir. 1979), and *Intern. Tel. & Tel. Corp. v. American Tel. & Tel.*, 444 F. Supp. 1148 (S.D.N.Y. 1978). In those cases, the courts cited *United States v. Utah Constr. Co.*, 384 U.S. 394, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966), for the rule that collateral estoppel effect could be given to findings of an administrative agency where the agency was acting in a judicial capacity and the parties were given a fair opportunity to litigate the issues.

There are three reasons that Black's estoppel argument fails. First, the hedge/speculation issue is not relevant to a determination of negligence. Second, Black cannot properly raise the issue under the test set out in *Newton v. Hornblower, Inc.*, 224 Kan. at 515. Finally, the Bank's determination that the transactions were a hedge was not the type of administrative agency action which invokes collateral estoppel.

Black argues that Wichita Federal should have sought review of the Bank's findings through the appropriate procedures under the Administrative Procedure Act. Black ignores the fact that this case is not an appeal of the Bank's findings, but a state law negligence action. To challenge the Bank's findings would be against the best interests of Wichita Federal, as it was those very findings which enabled Wichita Federal to remain open.

Black cites *North Mississippi Sav. & Loan Ass'n v. Hudspeth*, 756 F.2d 1096 (5th Cir. 1985), in which the court dismissed a claim for breach of contract brought by a former president of a savings and loan association. The savings and loan association had been placed in receivership of the FSLIC and, therefore, the court reasoned that Hudspeth must bring his claims before the Federal Home Loan Bank Board before seeking judicial review. In the case at bar, Wichita Federal has not been placed in FSLIC receivership. In addition, *Hudspeth* was essentially overturned this year in *Coit Independence v. FSLIC*, 489 U.S. _____, _____, 103 L. Ed. 2d 602, 622, 109 S. Ct. 1361 (1989): "Indeed, we hold explicitly in Part III that Coit is entitled to de novo consideration of its state law claims in court, and that FSLIC has no statutory authority to divest the courts of subject matter jurisdiction over those claims."

*Peoples' Sav. & Loan v. First Federal Sav. & Loan*, 677 F. Supp. 1104 (D. Kan. 1988), which is cited by Black, also relies on *Hudspeth*.

"While the courts of this state need not always accept an administrative agency's interpretation of its own regulations [citation omitted], it has long been recognized that, in order to insure effectiveness and uniformity, an agency's own interpretation of its regulations will be given great weight and, in some cases, controlling weight." *Hemry v. State Board of Pharmacy*, 232 Kan. 83, 85-86, 652 P.2d 670 (1982).

Black's argument that the findings of the Bank should have been given deference has some merit.

"The history of judicial review of the actions of federal banking authorities, that is, the Comptroller of the Currency and the FHLBB, is therefore marked by extraordinary deference to the technical policy decisions of the agencies in areas where Congressional guidance is slight. [Citation omitted.]" *City Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank*, 600 F.2d 681, 688 (7th Cir. 1979).

In its proposed findings of fact, Wichita Federal made the following statements:

"The defendant has argued that since a portion of this loss qualified for deferral, it must have been a hedge. If it was a hedge, then there is no negligence. This argument wholly misses the point. For accounting purposes, the propriety or business objectives for attempting a hedge are irrelevant. All that is important for accounting purposes is the intent, irrespective of how negligently it was done."

Although the trial court may have erred in finding that the transactions were speculation rather than a hedge, that finding does not affect the outcome of this litigation. The fact that the transactions were treated as a hedge for accounting purposes did not preclude a finding of negligence on the part of Black.

Is the plaintiff estopped from recovering from the defendant because of representations the plaintiff made on its tax return and audited financial statement?

Black argues that Wichita Federal should not be able to recover the loss from him because it claimed the loss on its 1985 income taxes and received tax benefits for its loss. It is uncontroverted that Wichita Federal claimed the loss and received a $7.3 million tax benefit because of the loss. Black bases his argument on a theory of "quasi-estoppel." Quasi-estoppel applies where a party has previously taken a position which is so inconsistent with the position now taken as to render the present claim unconscionable. *Fast v. Fast*, 209 Kan. 24, 29, 496 P.2d 171 (1972). Again, Black cites no authority for the proposition that

claiming the loss as a hedge loss precludes a finding that he was negligent.

Black downplays his role in the tax treatment of the hedge loss. 26 U.S.C. § 1256(e)(2)(C) (1982) requires that the transaction be clearly identified as a hedge on the day on which it is made. It was Black's representations to the Bank and the auditor that he intended a hedge which led to the finding that the loss could be claimed as a hedge.

The Internal Revenue Service regulations require that there be no reasonable prospect of recovery before a loss can be claimed pursuant to 26 U.S.C. § 165(a) (1982). 26 C.F.R. § 1.165-1(d)(2)(i) (1989). Black contends that the doctrine of quasi-estoppel should preclude recovery from him because Wichita Federal represented that it had no reasonable prospect of recovery when it claimed the loss on its 1985 tax return.

Black cites a number of cases interpreting the "reasonable prospect of recovery" requirement. All of these cases, however, are taxpayer appeals of the Commissioner of Internal Revenue's finding that they could not claim their loss in a certain year because they still had a reasonable prospect for recovery of all or part of the loss. None of those cases stand for the proposition that a suit for recovery of losses is barred by a prior claim of the losses on a tax return.

26 C.F.R. § 1.165-1(d)(2)(iii) provides for the situation in which the taxpayer has claimed a loss and subsequently receives reimbursement for the loss. A review of cases involving 26 U.S.C. § 111 (1982 and Supp. V 1987) indicates that, where a taxpayer has deducted a loss in a previous year and received tax benefits as a result, the taxpayer must claim any subsequent recovery of the loss as gross income and be appropriately taxed for that income. In *Randall v. Loftsgaarden*, 478 U.S. 647, 92 L. Ed. 2d 525, 106 S. Ct. 3143 (1986), the Supreme Court found that this "tax benefit rule" prevents undeserved windfalls where the taxpayer subsequently recovers a loss deducted and precludes the necessity of an offset for previous tax benefits received on the loss.

The record does disclose that Wichita Federal was contemplating recovery from Black at the time it filed its 1985 tax return. The issue of whether Wichita Federal made misrepresentations on its 1985 tax return is best left to the Internal Revenue Service.

The parties cite a number of cases which discuss the effect that taking certain tax benefits has on the outcome of subsequent litigation. In *H.J. Baker & Bro. v. Orgonics, Inc.*, 554 A.2d 196 (R.I. 1989), Baker sought recovery of money owed to it by Orgonics, alleging that Orgonics and its chief stockholder conspired to defraud Baker in the collection of the debt and that conveyances of real estate and other corporate assets of Orgonics to the stockholder were fraudulent. The defendants sought to present evidence that Baker had written the Orgonics debt off on Baker's 1984 tax return under I.R.C. § 166(a)(1) (1984), which requires that one have the belief that no recovery is possible in order to write off a bad debt. The Supreme Court of Rhode Island concluded:

"We agree with plaintiff's contention that claiming a § 166(a)(1) deduction does not bar a subsequent suit for the debt. [Citations omitted.] Because plaintiff was not precluded from taking the bad-debt deduction and simultaneously continuing efforts to collect the debt, any evidence of the deduction was irrelevant and properly excluded." 554 A.2d at 203.

In *Matter of Stafos*, 666 F.2d 1343 (10th Cir. 1981), the court denied Stafos a discharge in bankruptcy because he had made a materially false statement in writing concerning his financial condition which precluded discharge pursuant to 11 U.S.C. § 32(c)(3) (1970). The evidence showed that Stafos had furnished a written financial statement to a credit agency in 1967 which claimed Stafos' business had a net profit of $46,598.85 in 1966. Stafos' individual federal and state income tax returns for 1966 claimed a net loss of $9,442.70. The Court of Appeals found that the bankruptcy judge was justified in finding that the 1966 income tax return was correct and in refusing discharge. The income tax return was used to show that Stafos had lied on other financial statements. In the case at bar, it is not contended that Wichita Federal made any representations about the amount of its losses in financial futures which conflicted with the losses claimed on its income taxes.

In *Meccage v. Spartan Ins. Co.*, 156 Mont. 135, 477 P.2d 115 (1970), the plaintiff sued his insurer for fire losses on his trailer home. The issue was whether the trailer home was an improvement of real property or personal property. The insurance company sought to estop the plaintiff from claiming that the trailer home was an improvement of real property because the plaintiff

had claimed the trailer was personal property on the county tax assessment list and therefore had paid less tax then he would if the trailer had been claimed as an improvement of real property. The Supreme Court of Montana held:

"There is no basis for claiming an estoppel against such claim by the plaintiff here. The elements of estoppel are lacking. The record is devoid of any false or misleading representation by plaintiff to defendant insurer. There is nothing to indicate reliance by defendant insurer on the tax classification of plaintiff's property. Whatever the county's rights may be here, defendant insurer has no basis for claiming thereunder." 156 Mont. at 139.

Wichita Federal cites *Kornegay v. Thompson*, 157 Ga. App. 558, 278 S.E.2d 140 (1981), which was a trover action brought for the recovery of a valuable diamond ring. The defendant claimed that the plaintiff gave the ring to her as a gift. The evidence indicated that, at the time the plaintiff purchased the ring, he used the name of the defendant and an out-of-state address in order to avoid Georgia sales tax. The court said:

"Although we in no way condone this admitted violation of our tax laws, the defendant was also party to this conduct and had full knowledge thereof. Because of defendant's knowledge and the lack of evidence of any adverse change of position by defendant in reliance on plaintiff's misrepresentations, this conduct by plaintiff results in no estoppel upon which defendant may rely. [Citations omitted.]" 157 Ga. App. at 560.

Black attempts to distinguish *Kornegay* because the defendant in that case was a participant in the violation of the tax law. That fact, however, is what makes *Kornegay* analogous to this case. It was Black's assertion that he intended a hedge which led to the tax treatment of the loss. Black also distinguishes the cases cited by Wichita Federal because they discuss equitable estoppel and detrimental reliance. Black argues that detrimental reliance is not an element of quasi-estoppel.

Black argues that, by alleging that the transactions were speculation, Wichita Federal has taken a position inconsistent with its 1985 tax return and its audited financial statement, and that quasi-estoppel should be applied. Although claiming the transactions were speculation may be inconsistent with the accounting treatment, a claim that Black was negligent is not necessarily inconsistent with the accounting and tax treatment of the transaction. In his reply brief, Black admits that a finding that the transactions were a proper hedge does not necessarily preclude a finding of negligence. Given Black's role in the auditor's deter-

mination that the transactions could be given deferral treatment, it does not appear that Wichita Federal's previous claims were so inconsistent with its current claims as to make the current claims unconscionable.

## Was the defendant entitled to an offset against plaintiff's damages?

Black contends that the $17.5 million loss should have been offset by the $10.1 million increase in the value of the mortgage portfolio found by the auditor. Black does not cite any legal authority for this argument except for one case in his reply brief. Pittman testified and the trial court found that there was never a market valuation of the loans purportedly hedged. The court also found, "Any appreciation in value of plaintiff's loan portfolio was not caused by defendant's acts, but appreciated because of market conditions."

Although the market value of the mortgage portfolio may have risen due to market conditions during February through June 1985, there was no actual increase in the value to Wichita Federal because Wichita Federal had no intent to sell the mortgages. Richard O. Nelson, a certified public accountant, testified that short positions in financial futures which are taken for hedging purposes should be accounted for as accounts receivable from the broker until the positions are closed. He testified that any offsetting credit on the books would come out of cash. When asked about the $10,189,000 figure he had reached, Nelson said, "We used that number to determine whether or not that loss will correlate to the increase in value of the fixed-rate mortgages that were hedgable."

Robert Ball, a certified public accountant, testified that, while the accounting treatment of this transaction gives the impression that the mortgages have increased in value, the mortgages still have the same value they previously had. The loss is added to the value of the mortgages but is amortized over the life of the mortgages. Ball testified, "You replaced a good asset, cash, with something called 'deferred loss,' which is amortized for future periods."

A good analysis of the theory of offsetting benefits as argued by Black is made in *Macon-Bibb, Etc. v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048, 1055 (M.D. Ga. 1981):

"Basically where the defendant's tortious misconduct or breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of the benefit received. [Citation omitted.] The offset theory can only be utilized 'when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages and the failure to do so would permit the plaintiff to obtain unreasonable damages.'"

Black cites *Minpeco, S.A. v. Conticommodity Services, Inc.*, 676 F. Supp. 486 (S.D.N.Y. 1987), a case which arose out of trading in silver futures. Minpeco had sold silver futures short as a hedge of its holdings in physical silver. The defendants argued that whatever losses Minpeco incurred on its futures contracts were offset by the increase in value of is holdings in physical silver. The court said, "Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall." 676 F. Supp. at 488. The court concluded that Minpeco's damages should be offset by the increase in value of its actual silver holdings.

*Minpeco* can be distinguished from the case at bar in two respects. First, Minpeco had actual possession of the silver that it was seeking to hedge through selling short the futures contracts. Black does not contend that Wichita Federal ever owned the treasury bonds underlying the futures contracts he sold short. Second, *Minpeco* arose out of the manipulation of the silver market by the Hunt brothers in the early 1980s and the Hunts were the defendants in the litigation who raised the issue of offset. It was clear that the Hunts' manipulation of the market caused both Minpeco's loss in the futures contracts and its gain in its physical silver holdings. In the case at bar, any gain in the market value of the mortgage portfolio would have occurred regardless of Black's transactions in financial futures.

Despite the fact that Wichita Federal was able to defer $10.1 million of its losses, the $10.1 million is still a loss that will have to be taken over the next 15 to 20 years. Black's contention that it should offset the award of damages in this case has no merit.

Should the defendant have been allowed
to raise comparative negligence as a defense?

In *Federal Savings & Loan Ins. Corp. v. Huff*, 237 Kan. 873, 704 P.2d 372 (1985), this court held that the comparative fault

statute (K.S.A. 60-258a) does not apply to actions for economic damage. In *Huff*, the FSLIC, as receiver of an insolvent savings and loan association, brought an action in federal court against former officers and employees of the association for breach of fiduciary duty in making several improvident loans. The United States District Court for the District of Kansas certified the issue of the applicability of comparative negligence to this court pursuant to the Uniform Certification of Questions of Law Act (K.S.A. 60-3201 *et seq.*).

This court found that the comparative negligence statute did not apply to the action for several reasons. First, because the action was not one for which contributory negligence would have been a defense, the comparative negligence statute was not applicable See *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 666 P.2d 192 (1983). The court reasoned that a savings and loan association is a corporation and, accordingly, can only act through its directors and officers; therefore, it is legally impossible for the savings and loan association to be contributorily negligent.

The reasoning of the above argument is, however, somewhat suspect because the defendants in *Huff* were not seeking to compare the negligence of the savings and loan association itself, but rather to compare the negligence of each other as well as certain nondefendant individuals (borrowers, guarantors and appraisers). "The purpose of [the comparative fault] statute is 'to impose individual liability for damages based on the proportionate fault of all parties to the occurrence which gave rise to the injuries and damages even though one or more parties cannot be joined formally as a litigant or be held legally responsible for his or her proportionate fault.' " *McGraw v. Sanders Co. Plumbing & Heating, Inc.*, 233 Kan. 766, 771-72, 667 P.2d 289 (1983) (quoting *Brown v. Keill*, 224 Kan. 195, 207, 580 P.2d 867 [1978]).

Black seeks to have the negligence of the other directors compared to his negligence. He cites a number of findings by the trial court from which one could infer that the other directors were at least in some part negligent. The court also found that "[d]efendant journalized the margin calls representing these losses as though he were buying and selling securities. This method of bookkeeping could not have alerted plaintiff that defendant was trading in financial futures." In *Newton v. Horn-*

*blower, Inc.*, 224 Kan. 506, 516, 582 P.2d 1136 (1978), this court said:

"Defendants were the active managers and officers and partners of both the corporation and the limited partnership, and plaintiff, as a stockholder, director, and limited partner, totally relied upon the defendants' reports for his information. A review of the financial information and other corporate papers furnished by the defendants did not disclose any wrongdoing on behalf of the defendants. The trial court, in weighing the evidence presented, found that plaintiff acted in a reasonable manner in reviewing the financial information provided and that concealment by the defendants was the true cause of plaintiff's lack of knowledge."

Although the evidence indicates that the outside directors could not have known of Black's activities, there is some indication that Lawrence A. Tholen, the senior vice-president and secretary of the Board, should probably have been keeping closer tabs on Black. This is true especially in light of the findings of the Bank that there were not sufficient internal controls and that Black should not have been the sole person handling Wichita Federal's investments.

A second reason that the defense of comparative negligence was rejected in *Huff* was that the original comparative fault statute did not provide for recoveries of economic loss, but only for damages for "negligence resulting in death, personal injury or property damage." K.S.A. 60-258a. Two years later, the legislature amended K.S.A. 60-258a to specifically include claims for economic loss. (See K.S.A. 1988 Supp. 60-258a.) This amendment became effective July 1, 1987. In the case at bar, the alleged negligence and loss occurred in 1985 and the action was commenced in 1986, prior to the amendment of the comparative fault statute. "Generally, a statute operates prospectively unless its language clearly indicates the legislature intended it to operate retrospectively." *McGraw*, 233 Kan. at 768-69. When the legislature enacted the original K.S.A. 60-258a in 1974, it also enacted K.S.A. 60-258b, which stated: "The provisions of this act shall not apply to any cause of action which has accrued prior to the effective date of this act."

The majority of courts has held that a comparative fault statute which is silent as to retroactivity is not retroactive. Annot., 37 A.L.R.3d 1438. In *Crutsinger v. Hess*, 408 F. Supp. 548, 555 (D. Kan. 1976), the court held that the Kansas comparative fault

statute did not apply where the plaintiff's cause of action arose before July 1, 1974.

Black cites *Wilfong v. Batdorf*, 6 Ohio St. 3d 100, 451 N.E.2d 1185 (1983), for the proposition that comparative fault statutes should be given retroactive application. The Supreme Court of Ohio has addressed this issue more recently in *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St. 3d 100, 108, 522 N.E.2d 489 (1988):

> The majority in *Wilfong*, having discarded the proper inquiry in such matters, irrationally concluded that the comparative negligence statute was remedial since it did 'not alter a defendant's liability for his negligent acts. . . .' *Id.* at 104, 6 OBR at 165, 451 N.E.2d at 1189. Quite the reverse was obvious to most legal observers in Ohio since contributory negligence, which was obviated by the statute then at issue, had been, under the common law, a complete defense to any recovery, since it constituted an intervening cause of the plaintiff's injury. By mischaracterizing what was clearly a substantive defense, and by narrowly focusing upon the additional statutory provision allowing a prorata recovery, that decision created confusion for the substantive/remedial inquiry. Through the discussion herein we hopefully avoid this detour from sound legal analysis."

Because comparative fault is a substantive defense, the 1987 amendment to K.S.A. 60-258a (which overruled *Huff*) is not applicable to this action.

### Is the plaintiff entitled to prejudgment interest?

Wichita Federal argues that the trial court erred in not awarding it prejudgment interest. Wichita Federal argues that prejudgment interest can be awarded in tort cases where the claim for damages is liquidated. Wichita Federal claims that the amount of its losses was never an issue. This is directly in conflict with the statement of issues made by Wichita Federal at oral argument and in the pretrial conference. Wichita Federal raised the amount of its damages as an issue in this case. In addition, the amount of damages could not possibly have been liquidated until the issue of offset was determined. As mentioned before, there is at least a question of whether the damages in this case should be $17.5 million or $17.1 million.

"[T]he district courts are vested with considerable discretion in the awarding of interest damages upon restitutory sums. Considerations of fairness and traditional equitable principles are to guide the exercise of this discretion." *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 468, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977) (quoting *Brooklyn Union Gas Co. v. Transcon-*

*tinental Gas P. L. Corp.*, 201 F. Supp. 679 [S.D. Tex. 1960], *aff'd* 299 F.2d 692 [5th Cir. 1962]). There is no indication that the denial of prejudgment interest in this case was an abuse of discretion.

Affirmed.

HOLMES and SIX, JJ., not participating.