No. 62,658

WILDA FRANCES YOUNG CONNER, *Appellant*, v. KOCH OIL COMPANY, a division of KOCH INDUSTRIES, INC.; DARREL PATTESON; FRANK PATTESON; and PATTESON BROTHERS, INC., *Appellees*.

(777 P.2d 821)

Opinion filed July 14, 1989.

*Robert Hall,* of Wichita, argued the cause and *John W. Wall,* of Sedan, was with him on the brief for appellant.

*James B. McKay, Jr.,* of McKay & McKay, of El Dorado, and *Tim Brazil,* of Henshall, Pennington & Brazil, of Chanute, argued the cause and *David A. Brace,* of Moline, and *Debra Haifleigh,* of Wichita, were with them on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is an action for recovery of money and to quiet title to real estate. Appellant Wilda Conner claims to have purchased an unleased, undivided one-half mineral interest in certain property as well as a cause of action against appellees Koch Oil Company, Darrel Patteson, Frank Patteson, and Patteson Brothers, Inc. (Pattesons). Conner seeks to recover money for oil produced, saved, and marketed by recovery on open account through a theory of conversion or by the imposition of a constructive trust.

The property in question was previously owned by E. H. and Burneta Adair. Burneta is Wilda Conner's sister. The property was leased for oil and gas to the Pattesons under a standard

lessee's ⅞ royalty. The Pattesons developed oil and gas production on the land, perpetuating the lease. Upon E. H. Adair's death, Burneta sold the land and one-half of the minerals to Nile and Jessie McNee, reserving unto herself one-half of the minerals. Her executrix's deed was filed April 5, 1965. Burneta and the McNees each thus received one-half of the ⅛ landowners' royalty under the Patteson lease from Koch Oil Company, purchaser of the production.

In 1972, the Pattesons incorporated their business with the title of Patteson Brothers, Inc., and desired to consolidate their leases to effect a savings in storage and production equipment expense. They chose to release the leases and take new leases in the corporate name. This technique is difficult to understand since assignment of the leases by the lessees accomplishes the same result without the hazard of losing the developed leases.

The inevitable happened. The Pattesons mistakenly believed the McNees owned all the property involved in this dispute, overlooking Burneta's reservation of an undivided one-half interest in the minerals. No title search was made.

On May 11, 1972, the Pattesons executed standard forms entitled "Release of Oil & Gas Lease." The forms described the subject property and noted the original lessors and lessees in 1936 and 1960. The McNees, not being the original lessors, were not mentioned in the releases. The leases were for a primary term and so long thereafter as production in paying quantities continued. The leases were perpetuated by production in paying quantities and were thus in their secondary term. After the standard printed language of the releases, the Pattesons typed the following caveat: "for the consideration of being granted a new lease covering the above described land and other lands." The McNees granted the Pattesons a new oil and gas lease covering the subject land. Burneta did not, as no new lease was requested from her. She continued to receive her royalty payments as before, which she accepted.

The new McNee lease, dated August 5, 1972, contained the following provision:

"It is understood and agreed that this lease consolidates five leases which are operating and producing oil or gas in paying quantities at this date. Said five leases are released of record as of this date and the terms of said leases are hereby merged into this lease. It is further understood and agreed that the primary term of each of the five leases has expired and they are in their secondary term by

reason of production of oil or gas in paying quantities. It is the purpose of this lease to continue production of oil or gas by the lessee under name and style of Patteson Bros., Inc., a Kansas Corporation."

The Pattesons filed the releases October 4, 1972. They continued production as usual, and Koch continued to make royalty payments to both the McNees and Burneta Adair, one-half of one-eighth interest to each.

Burneta Adair died on May 9, 1983, and on April 9, 1984, Wilda Conner made a written offer to purchase the estate's "oil and gas *royalties*" for 75% of their appraised value. This amounted to $27,267 for the royalty interest in the subject property. The offer did not include an offer to purchase any choses in action owned by the estate. The sale was approved "as set forth in the formal written offer" by the district court on April 18, 1984. The court's order stated that "title to and right of possession to all assets of the estate not specifically identified and referenced in the written offer to purchase of April 9, 1984 shall remain in the Co-Executors subject to further order by this Court."

The next day, one of the estate's attorneys wrote Mrs. Conner's attorney, stating in part:

"6. The effective date of the sale of the oil and gas royalties shall be deemed to be as of midnight, April 18, 1984. The executors will be requested to notify the oil companies involved and request that payments due be prorated as of April 18, 1984. All payments due for the period of time through April 18, 1984, shall be deemed property of the estate and all payments subsequent to April 18, 1984, shall be deemed the property of Mrs. Conner. Formal assignments of the royalty interests will be duly prepared and executed in the near future."

On April 23, 1984, the estate executors continued to act as if the estate's share of the minerals was under lease. They notified Koch they had sold the estate's interest and requested payments be held in suspense pending legal documentation.

On May 14, 1984, another attorney for Burneta's estate notified Conner's attorney there was a possibility the leases had been released. An executor of the estate notified Koch on February 12, 1985, that "legal technicalities" were delaying transfer of title to Conner. He expected further delays and therefore rescinded the estate's request of April 23, 1984, and asked that accumulated funds in suspense be paid to the estate, and regular monthly payments of royalties be resumed. Again, the estate acted as if there were a valid oil and gas lease on the property. Koch complied.

The executors finally conveyed the "mineral interests" of Burneta Adair to Wilda Conner on June 19, 1985. On June 28, 1985, Conner wrote Koch asking that "royalty payments" be sent to her. Koch again complied.

On June 10, 1986, Conner filed this suit, claiming the Pattesons produced and sold oil from the subject property after May 11, 1972, without a valid oil and gas lease on one-half of the minerals. She claimed Koch illegally paid the share of proceeds due Burneta and her after May 11, 1972, to the Pattesons. From May of 1972 to April of 1986, Koch had paid the Pattesons $1,645,499.16 as payments for their ⅞ interest in the oil produced from the subject land. Conner seeks to recover one-half of this amount, less costs of operations.

While the action was pending, Conner became aware the executor's deed did not convey any causes of action Burneta's estate may have had against the Pattesons. She therefore obtained an order on November 23, 1987, correcting the conveyance to include "all choses in action and causes of action which the Co-Executors have had, now have or may have against all persons or entities, occurring, arising, created or which became vested in the Co-Executors by reason of failure to account and pay the Co-Executors and their predecessors in title for oil, gas, and other minerals heretofore produced, saved and marketed from said lands above described."

On June 24, 1988, the trial court found Conner should take nothing for her claims and quieted the title in the Pattesons' favor. The court reformed the documents in question to carry out the actual intentions of the parties—to consolidate, rather than release, the leases.

In order to evaluate the trial court's decision in deciding the case on equitable grounds, let us examine additional facts. Burneta Adair employed Jerry Schaplowski as her accountant in 1964. He became her business manager in 1972. This position entailed managing her oil interests, including the leases in question. In his position as business manager for Burneta, Schaplowski had become aware of the releases filed by Patteson by November 14, 1980. He made copies of the releases and put them in the Adair Oil Company files. Schaplowski knew Burneta had not executed a new lease to Patteson. In spite of that, he did not inform her of the releases, deeming them a "technical"

problem undeserving of discussion. He obviously considered the former lease still in effect. Schaplowski became co-executor of Burneta's estate when she died on May 19, 1983.

Burneta Adair thus had constructive notice of the releases in November of 1980 when her business manager placed the releases in her file. A principal is charged with the knowledge of an agent acting within the scope of his authority even though the knowledge is not communicated to the principal. *Holley v. Allen Drilling Co.*, 241 Kan. 707, Syl. ¶ 5, 740 P.2d 1077 (1987). Obviously, Burneta Adair did not consider the releases applicable to her leased mineral interest. By the same token, the Pattesons also did not think the release applicable to any interest owned by Burneta Adair because they were unaware she had reserved an interest in the minerals from the sale of the land to the McNees. This is clearly a mistake of fact mutual to the Pattesons and Burneta Adair.

If the releases were reformed to specifically exempt the undivided one-half interest of Burneta Adair in the minerals lying under the described real estate, they would conform to the intention of the Pattesons and the understanding of Adair. Reformation is an equitable remedy available to correct mutual mistakes of fact. See *Schlatter v. Ibarra*, 218 Kan. 67, Syl. ¶ 2, 542 P.2d 710 (1975), where we found reformation proper "where real property has been included by mistake in a legal instrument which the parties never intended should be conveyed, which the grantor was under no legal or moral obligation to convey, and which the grantee in good conscience has no right to retain." There is mutual mistake of fact in this case in the sense that both Burneta Adair and the Pattesons believed, and acted upon their belief for years, that the Pattesons held a lease over all the minerals in the subject property. See *Harper v. Continental Oil Co., Inc.*, 805 F.2d 929 (10th Cir. 1986). Even after Burneta's manager discovered the release in 1980, the mistake continued in that the parties continued to believe the Pattesons held a lease on all the Adair minerals.

Even if the mistake were unilateral to the Pattesons, reformation would not be barred under the circumstances. Reformation has been held to be available in cases of unilateral mistake to correct transfers of real estate without consideration. See *Harper v. Continental Oil Co., Inc.*, 805 F.2d 929; *Dodge v. United*

*States,* 413 F.2d 1239, 1242 (5th Cir. 1969). In *Geiger v. Hansen,* 214 Kan. 83, 87, 519 P.2d 699 (1974), we found a unilateral mistake "may be a good *defense* where hardship amounting to injustice would otherwise be inflicted on a party by holding him to the agreement." (Emphasis supplied.)

In *Harper,* Conoco' mistakenly included a productive tract of land in an oil and gas release. The United States Court of Appeals, 10th Circuit, upheld the finding of the United States District Court for the District of Kansas that reformation was available even though the mistake was unilateral because the actual result of the mistake was a gratuitous transfer of the lease. The court further held that laches did not bar reformation as there had been no detrimental reliance by any purchaser based on the release.

It should also be noted here that reformation of an instrument relates back, and takes effect from, the time of its original execution, and binds all entities except innocent purchasers for value. See 66 Am. Jur. 2d, Reformation of Instruments § 11.

As stated above the rights of innocent third parties can properly prevent reformation. *Beams v. Werth,* 200 Kan. 532, 544, 438 P.2d 957 (1968). The question here then is whether Wilda Conner is an innocent purchaser for value as she contends. A review of the evidence discloses that the trial court was correct in finding she is not. Conner purchased the producing minerals inventoried in the Adair estate for ¾ of their appraised value. The appraised value was based on a 1/16 interest in producing royalty under the Patteson lease. Conner paid only for the 1/16 interest. The idea of claiming a one-half working interest in the lease since 1972 came later. The purchase of the chose in action from the estate also came later, a purchase for which Conner paid no further consideration. Substantial competent evidence supports the trial court's finding that Wilda Conner was not an innocent purchaser for value of the Adair minerals. Conner is thus shouldered with all the title impediments of her predecessor in title and is subject to the same defenses.

Conner argues reformation of the releases is barred by K.S.A. 60-511, which requires that any action to reform a contract be brought within five years. See *Beams v. Werth,* 200 Kan. at 544. However, this rule is inapplicable for several reasons. The purpose of statutes of limitation is to "secure the peace of society

and to protect the individual from being prosecuted upon stale claims." *Rochester American Ins. Co. v. Cassell Truck Lines,* 195 Kan. 51, 54, 402 P.2d 782 (1965). Thus, statutes of limitation are not intended to bar matters asserted in *defense* of an action. In *Muckenthaler v. Noller,* 104 Kan. 551, 180 Pac. 453 (1919), an action was brought to enforce contribution on a note which the plaintiffs were obligated to pay. The defendants answered that their signatures on the note were obtained by fraud. The plaintiffs argued this defense was barred by the statute of limitations. We held that, while a barred cause of action may not be used to obtain affirmative relief, it may be used as a "pure defense" to defeat a plaintiff's right of recovery.

Conner argues the trial court erred in quieting title to the Pattesons because this amounted to affirmative relief barred by the statute. The quieting of title, however, was the logical extension of the reformation of the releases, and was asserted by the Pattesons as a defense to Conner's suit. The affirmative relief granted was only incidental to the reformation of the releases. Where parties have peacefully acted in accordance with what they understand and intend to be their rights, reformation is allowed as a *defense* to a suit to enforce the literal language of an instrument which through mistake does not evidence the intention of the parties, regardless of how many years have passed before the suit is brought.

Expression of this rule is found in *Detweiler v. Swartley,* 74 Kan. 855, 86 Pac. 141 (1906). There the heirs agreed to deed land to the executor to pay debts owed by the estate to others and a debt to him of $13,000. In a collateral agreement, the executor agreed to divide any excess proceeds from the use or sale of the land to the heirs. The collateral agreement, however, stated that the amount owed the executor was only $5,000. Many years passed before one of the heirs sued for a share of the land based on the lesser debt recited in the collateral agreement. The trial court reformed the collateral agreement to state the correct debt, clearly shown by the evidence, and held against the plaintiff. We affirmed, finding reformation proper to carry out the intentions of the parties. No innocent third party had detrimentally relied on the mistaken instrument, and to enforce the instrument would have prejudiced one party and resulted in a windfall to the other.

We conclude that the equitable remedy of reformation is

available to express the intention and understanding of the parties. The releases of oil and gas leases are therefore reformed, exempting Burneta Adair's undivided one-half interest in and to the oil, gas, and other minerals lying in and under the East Half of the Southwest Quarter (E/2 SW/4), the West Half of the Southeast Quarter (W/2 SE/4), and the Southeast Quarter of the Southeast Quarter (SE/4 SE/4) of Section 14, Township 32 South, Range 10 East, Chautauqua County, Kansas, therefrom. The reformation relates back to May 11, 1972, takes effect from that date, and is binding on Conner who stands in the same relation to the Pattesons as Burneta Adair. Thus, the original oil and gas leases dated September 15, 1936, and March 1, 1960, are in full force and effect as to Conner.

The judgment of the trial court is affirmed.