**MONARCH NORMANDY SQUARE PARTNERS, Plaintiff,**

v.

**NORMANDY SQUARE ASSOCIATES LIMITED PARTNERSHIP, et al., Defendants.**

**NORMANDY SQUARE ASSOCIATES LIMITED PARTNERSHIP, et al., Plaintiffs and Counterclaim Defendants,**

v.

**MONARCH NORMANDY SQUARE PARTNERS, et al., Defendants and Counterclaim Plaintiffs.**

**Civ. A. Nos. 88–1388–MLB, 88–1513–MLB.**

United States District Court,
D. Kansas.

March 16, 1993.

See also 817 F.Supp. 896, 817 F.Supp. 899, 817 F.Supp. 919.

James A. Walker, Triplett, Woolf & Garretson, Wichita, KS, T. Barry Kingham, Curtis, Mallet–Prevost, Colt & Mosle, New York City, Warren Dennis, Proskauer, Rose, Hoetz & Mendelsohn, Washington, DC, Marc Marmaro, Jeffery, Mangels & Butler, Los Angeles, CA, for plaintiffs.

Terry L. Malone, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, KS, for defendants Monarch Normandy Square Partners, Al Fenstermacher, Richard Hoagland, Richard Rayl, BMRD, Monarch Properties Inc., Monarch Real Estate Co., Inc. and Monarch Securities, Inc.

J. Michael Kennalley, Hershberger, Patterson, Jones & Roth, Wichita, KS, for defendant Helsley, Mulcahy & Fesler.

Philip L. Bowman, Adams, Jones, Robinson & Malone, Wichita, KS, for defendant William C. Grieger.

Terry L. Malone, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, KS, Steven C. Kiser, Law Offices of Steven C. Kiser, Newport Beach, CA, for defendant Steven C. Kiser.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendants' Monarch Normandy Square Partners (MNSP), Al Fenstermacher, Richard Hoagland, Richard Rayl, BRMD, Monarch Properties, Inc., Monarch Real Estate Co., Inc., Monarch Securities, Inc., Steven C. Kiser, and William C. Grieger's motion for summary judgment, pursuant to Fed.R.Civ.P. 56. (Doc. 331)[1] The plaintiffs (Civil Action 88–1513) have brought claims against these defendants alleging fraud, negligent misrepresentation, civil conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* MNSP also seeks summary judgment on its claims in Civil Action 88–1338.

These consolidated actions arise from the sale of the Normandy Square Apartments (NSA), a 276 unit apartment complex in Wichita, Kansas, in October, 1985. Monarch Normandy Square Partnership (MNSP), a California limited partnership whose general partners are Richard Hoagland, Al Fenstermacher, Richard Rayl, and BRMD, purchased NSA in 1983. In the summer of 1985, it offered to sell NSA for a list price of $6.75 million. On July 19, 1985, Richard Gleicher made an offer to purchase NSA for $6.75 million. Gleicher made a $15,000 earnest money deposit by tendering a check on the account of his management company, Premier Management, Inc. Gleicher requested and received a copy of the For Sale Package for the apartment complex and an Offer to Sell NSA from Steven Kiser[2] shortly there-

---

1. There is some confusion about which parties are the plaintiffs. For purposes of this motion, the court will refer to NSALP, Anchor Properties, Richard Gleicher, and J. Stanley Pottinger as the plaintiffs and MNSP, Al Fenstermacher, Richard Hoagland, Richard Rayl, BRMD, Monarch Properties, Inc., Monarch Real Estate Co., Inc., Monarch Securities, Inc., Steven C. Kiser, and William C. Grieger as the defendants.

For purposes of trial, the court will treat NSALP, Anchor Properties, Richard Gleicher, and J. Stanley Pottinger as the plaintiffs and have them present their evidence first.

2. Steven Kiser is Vice President and general counsel of Monarch Properties, Inc., which managed NSA prior to November 1, 1985.

after. After making a few minor changes, Gleicher returned the Offer to Sell on August 9, 1985. Additional negotiations thereafter ensued.

On August 28, 1985, Gleicher and his assistant conducted an on-site inspection of NSA. He also visited several other apartment complexes in the vicinity of NSA. During his visit, William Grieger, an employee of MNSP, provided Gleicher a copy of financial statements covering NSA's operations for 1984 and for the first seven months of 1985. After returning to Boston, Gleicher wrote Kiser on September 4, 1985, and requested additional information concerning NSA, including the collected rents, vacancy rate, delinquent rents, and move-in bonuses. Kiser provided the information Gleicher requested on September 19, 1985.

On September 19, 1985, Gleicher executed a Real Estate Purchase Contract to purchase NSA. On September 24, 1985, MNSP executed the Real Estate Purchase Contract and sent two copies to Gleicher's attorney.

As the negotiations for the sale of NSA were proceeding, Gleicher was busy arranging to syndicate NSA to a group of investors. Gleicher planned to set up a limited partnership and offer investors an opportunity to invest therein. To that end, Gleicher hired a major accounting firm[3] and law firm[4] to assist in the preparation, drafting, and review of financial projections associated with the offering documents of the limited partnership. The venture was designed as a tax shelter for the investors.

Gleicher's representatives inspected NSA on September 25–26, 1985. On October 18, 1985, a partner of the New Manhattan Corporation[5] wrote a letter to Dennis Schreves of American Real Estate Analysts (A.R.E.A.) asking that A.R.E.A. perform a property analysis and appraisal. A.R.E.A. performed the appraisal and informed Gleicher prior to October 30, 1985, that NSA had a value of

$6.8 million, an amount in excess of what Gleicher planned to pay for it.

In mid-October, 1985, Monarch Properties, Inc. staged a promotion that plaintiffs refer to as the October Tenant Bonus Promotion, wherein Monarch Properties, Inc. offered eighteen tenants move-in bonuses of up to $400. The total amount of these bonuses was $6,290. The rent rolls provided by the defendants on October 20, 1985, identified these eighteen persons and indicated the tenants had prepaid their November rent. In fact, Monarch Properties, Inc. paid these move-in bonuses. This fact was not disclosed to the plaintiffs.

On October 30–31, 1985, a closing for the sale of NSA was held in Wichita, Kansas. MNSP sold NSA to Richard Gleicher, who transferred it to Normandy Square Associates Limited Partnership (NSALP). NSALP is a Massachusetts limited partnership whose general partner is Anchor Properties. Anchor Properties is a New York general partnership whose general partners are Richard Gleicher and J. Stanley Pottinger. As part of the consideration for the sale, NSALP assumed a mortgage on NSA and executed a promissory note in the amount of $320,000 in favor of MNSP.

Following the closing, Kiser informed Gleicher that Monarch Properties, Inc. was not interested in managing NSA on the terms requested by Gleicher and Pottinger. In its place, Gleicher hired Linda Bruno to manage NSA. Bruno had previously worked for Monarch Properties, Inc., and received a $10,000 bonus shortly before the sale was consummated. Over the next several months, Bruno and Gleicher were in regular contact concerning various operational matters at NSA. Bruno contends that she reported that tenants of NSA who had received rent coupons from Monarch continued to use the rent coupons to pay part of their rent. Gleicher denies receiving the information for the months of December, 1985, and January, 1986, but he admits receiving it for the

---

3. Arthur Anderson.

4. Sidley and Austin.

5. The New Manhattan Corporation was a party to an agreement with Gleicher to syndicate NSA.

The proposal to retain A.R.E.A.'s services was "subject to approval of this agreement by Anchor Properties ..." Gleicher and J. Stanley Pottinger are the general partners of Anchor Properties.

months of February and March, 1986. In addition, Gleicher admits that he received and responded to a January 29, 1986, letter from Bruno in which she suggested that "move-in bonuses of at least $150 should [be] (sic) *continued* to be offered." (Doc. 333, ¶¶s 45–50) (emphasis added)

The occupancy level of NSA declined in the months following the sale. On May 14, 1986, Gleicher terminated Bruno's employment.

NSALP defaulted on the promissory note in December, 1987. NSALP, Anchor, Pottinger and Gleicher filed suit in federal court in California on April 20, 1988, claiming their failure to perform their contract was caused by incomplete and inaccurate information they received when they decided to purchase the apartment complex. They alleged claims of fraud, negligent misrepresentation, civil conspiracy, and RICO violations against the defendants. The predicate acts alleged to form the basis of the RICO violations were mail fraud [6] and wire fraud.[7] In addition to the sale of NSA, the plaintiffs alleged that MNSP, Fenstermacher, Hoagland, Rayl, BRMD, HMF, Grieger and Kiser committed mail fraud and wire fraud when they failed to disclose to the purchasers of the Oak Park Apartments, an apartment complex in Lenexa, Kansas, of the use of rent concessions granted to tenants and falsely represented the accuracy of a list of rents being collected in the apartment complex. (¶¶ 33–35 of Pretrial Order) MNSP in turn filed suit in Kansas to enforce the terms of the promissory note. The actions have been consolidated.

### Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265

(1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States*, 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir. 1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir.1991). The court reviews the evidence in a light most favorable to the non-moving party, *e.g.*, *Washington v. Board of Public Utilities*, 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

---

6. 18 U.S.C. § 1341.

7. 18 U.S.C. § 1343.

## RICO Claims

RICO authorizes civil suits by "any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962." 18 U.S.C. § 1964(c). The plaintiffs allege a violation of 18 U.S.C. § 1962(c),[8] which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(¶ 41, Pretrial Order)

■ In order to state a RICO claim under § 1962(c), the plaintiffs must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[9] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

The defendants argue the plaintiffs have failed to establish either the pattern or enterprise requirements. The court will address each of these elements separately.

### Pattern of Racketeering Activity Requirement

18 U.S.C. § 1961(5) does not so much as define a "pattern of racketeering activity" as state a minimum necessary condition for such a pattern. It provides that a "pattern of racketeering activity"

> requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

In *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court addressed what conduct satisfies RICO's pattern requirement. In *H.J.*, customers of the telephone company

filed a class action alleging that approval of excessively high rates had been obtained through bribery of five of the commissioners of the state Public Utility Commission. The district court dismissed the complaint on the basis that the plaintiffs had alleged only a single scheme to inflate phone rates, which was insufficient under the Eighth Circuit's multiple scheme requirement. *H.J. Inc. v. Northwestern Bell*, 648 F.Supp. 419 (D.Minn. 1986), on reconsideration, 653 F.Supp. 908 (D.Minn.1987). The Eighth Circuit affirmed. 829 F.2d 648 (8th Cir.1987). The Supreme Court granted certiorari and reversed.

After reviewing the text and the legislative history of the pattern requirement, the Court held that in order to prove a pattern of racketeering activity, a plaintiff must show that the racketeering predicate acts are **related** and that they amount to or pose a threat of **continued** criminal activity. *Id.* 492 U.S. at 239, 109 S.Ct. at 2900.

The Court proceeded to discuss the relatedness and continuity requirements. For the **relatedness** requirement, the Court found guidance in the provisions of the Organized Crime Control Act of 1970 (18 U.S.C. § 3575(e)), which provided:

> Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

The Court believed Congress intended the same notion of the relationships between predicates for RICO's pattern requirement. *Id.* at 240, 109 S.Ct. at 2901.

■ As for the **continuity** requirement, the Court rejected a multiple scheme requirement and stated, "What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.*" *Id.* at 241, 109 S.Ct. at 2901. To establish **continuity**, a plaintiff must demonstrate either "a closed period of repeated conduct" or

---

8. The plaintiffs' counsel informed the court during oral argument that plaintiffs' RICO claims arose under § 1962(c) and § 1962(d). The latter provision makes it unlawful to conspire to violate § 1962(a), (b), or (c).

9. The plaintiffs allege the defendants engaged in a pattern of racketeering activity, not the unlawful collection of a debt.

"past conduct that by its nature projects into the future with a threat of repetition." *Id.* **Close-ended** continuity requires "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* **Open-ended** continuity requires a clear threat of future criminal conduct related to past criminal conduct. *Id.*

■ In the case at bar, the plaintiffs initially alleged that MNSP, Fenstermacher, Hoagland, Rayl, BRMD, HMF, Grieger and Kiser committed mail fraud and wire fraud in connection with the sale of the Oak Park Apartments, an apartment complex in Lenexa, Kansas, by failing to disclose of the use of rent concessions granted to tenants and falsely representing the accuracy of a list of rents being collected in the apartment complex. (¶¶ 33–35 of Pretrial Order) In response to defendants' motion for summary judgment, however, the plaintiffs offered no evidence to support this allegation. In the court's view, the plaintiffs are required to allege facts with enough specificity to believe there is probable cause the defendants committed mail fraud or wire fraud. Fed. R.Civ.P. 9(b); *See Bamco 18 v. Reeves* 675 F.Supp. 826, 829–30 (S.D.N.Y.1987) (Citation omitted) The plaintiffs' bald and conclusory allegations concerning alleged fraud in connection with the sale of the Oak Park Apartments fail to satisfy this standard. *Cf. Weiszmann v. Kirkland and Ellis,* 732 F.Supp. 1540, 1546 (D.Colo.1990).

At oral argument, the plaintiffs shifted their position and contended that the pattern of racketeering activity occurred between February, 1985, and May, 1986, and the predicate acts relate solely to the defendants' actions in connection with the sale of NSA. However, there is no evidence in the record that MNSP attempted to sell NSA prior to the summer of 1985, and therefore no evidence that the defendants could have committed any predicate acts prior to June, 1985. In any event, the plaintiffs cannot establish continuity.

*Close-ended continuity*

■ The plaintiffs conceded at oral argument that they do not allege open-ended continuity. The court will therefore focus its analysis on close-ended continuity.[10] The alleged predicate acts relating to the sale of the Oak Park Apartments, took place at some time between June and December, 1984, while the alleged fraud relating to NSA occurred in September and October of 1985. The *H.J.* court stated that the series of related predicates acts comprising a close-ended pattern must extend over a *substantial* period of time. *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. The plaintiffs' allegations fail to meet this standard. The duration of the alleged conduct out of which the predicate acts arise is at most approximately one year. This suggests the absence of close-ended continuity. *See Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610 (3rd Cir. 1991), *cert. denied* —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992) (Citations omitted); *Johnston v. Wilbourn,* 760 F.Supp. 578, 588–89, n. 16 (S.D.Miss.1991). Moreover, even if the predicate acts alleged by the plaintiffs extend beyond one year, close-ended continuity is not solely concerned with the mere duration of the predicate acts. *Hindes v. Castle,* 937 F.2d 868, 875 (3rd Cir.1991). The sporadic and isolated nature of the defendants' alleged conduct also tends to undercut any close-ended continuity. *See Continental Realty Corp. v. J.C. Penney Co., Inc.,* 729 F.Supp. 1452, 1454–55 (S.D.N.Y. 1990) (conduct in close-ended scheme occurred over too short a time to constitute long-term criminal conduct where predicate acts occurred over period of more than one year); *Cf. Disandro–Smith & Assoc. v. Edron Copier Service,* 722 F.Supp. 912, 916 (D.R.I.1989) (three sales of used copy machines within approximately two years held not to constitute the "long-term criminal conduct" that civil RICO is intended to redress). The two apartment sales involved different purchasers and were separated in time by approximately one year. The plaintiffs' alle-

---

**10.** The plaintiffs do not address the continuity requirement in their memorandum in opposition to defendants' motion. (Doc. 371)

gations do not implicate any concern with long-term criminal conduct. *See Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1555–56 (10th Cir.1992).

The RICO allegation offered by the plaintiffs during oral argument also fails to satisfy close-ended continuity. There is no evidence in the record that any predicate acts involving NSA took place prior to June, 1985. Even if the court were to give credence to plaintiffs' allegation that Bruno's actions following the closing continued the pattern of racketeering activity until May, 1986, the duration of the predicate acts was less than one year. This period is not substantial enough to be considered long-term criminal activity. *Hughes,* 945 F.2d at 611; *Helman v. Murry's Steaks, Inc.,* 742 F.Supp. 860, 881–82 (D.Del.1990). Moreover, the absence of multiple victims and multiple schemes tends to indicate the existence of a contractual dispute between two parties, not a pattern of racketeering activity. *J.D. Marshall Intern. v. Redstart, Inc.,* 935 F.2d 815, 820–21 (7th Cir.1991); *Terry A. Lambert Plumbing v. Western Sec. Bank,* 934 F.2d 976, 980–82 (8th Cir.1991).

The court holds the plaintiffs have failed to establish the pattern requirement of RICO.

### *Enterprise Requirement*

■ Even if the plaintiffs could satisfy the pattern requirement, the court also finds the plaintiffs cannot satisfy the enterprise requirement. As was true of the term "pattern of racketeering activity", the term "enterprise" is not actually defined in the statute, but rather is described by way of example. 18 U.S.C. § 1961(4) provides:

"Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

The plaintiffs have alleged that the Monarch Group,[11] Fenstermacher, Hoagland, Rayl, HMF, Grieger and Kiser constitute an "enterprise" within the meaning of § 1961(4). (¶ 42 of Pretrial Order) MNSP, Fenster-

macher, Hoagland, Rayl, BRMD, Monarch Group, HMF, Grieger and Kiser are alleged to be employed by, or associated with the enterprise. (¶ 43 of Pretrial Order) MNSP, Fenstermacher, Hoagland, Rayl, BRMD, Monarch Group, HMF, Grieger and Kiser are alleged to have conducted and/or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. (¶ 44 of Pretrial Order)

■ The plaintiffs have the burden of proving an "association in fact" with a common purpose and a continuing, ascertainable structure separate and distinct from the pattern of racketeering. *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989); *United States v. Riccobene,* 709 F.2d 214, 222 (3rd Cir.), *cert. denied, Ciancaglini v. United States,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *Cf. United States v. Sanders,* 928 F.2d 940, 943–44 (10th Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991) (court notes differing views on how separate and distinct the existence of the enterprise must be from the pattern of racketeering, but employs the more stringent test set forth in *Riccobene* ); *Raymark Industries, Inc. v. Stemple,* 714 F.Supp. 460, 473 (D.Kan.1988); *NL Industries, Inc. v. Gulf & Western Industries,* 650 F.Supp. 1115, 1128 (D.Kan.1986). As the court in *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299 (D.Colo.1984), reasoned:

If the enterprise can be co-extensive with the racketeering activity ... the statute could simply state that it is unlawful ... to engage in a pattern of racketeering activity. Further, if the enterprise were merely the cumulation of the predicate acts ... RICO would be nothing more than a tool for combating recidivists.

*Id.* at 1305.

■ The plaintiffs must allege specific facts, not mere conclusory allegations, which establish the existence of the enterprise. *Manax v. McNamara,* 842 F.2d 808, 811 (5th Cir.1988). The court has reviewed the pretrial order and finds no allegation that the

---

11. The so-called Monarch Group consists of MPI, MRE, and MSI. (p. 17 of Pretrial Order) The court treats all references to the Monarch Group as alleging conduct by all three defendants.

"enterprise" consisting of the Monarch Group, Fenstermacher, Hoagland, Rayl, HMF, Grieger and Kiser has any ongoing organization or purpose distinct from the conduct related to the alleged predicate acts. Accordingly, the court holds the plaintiffs have failed to establish the enterprise element of RICO.

Additionally, the court notes that the Tenth Circuit has held that a "person" violating § 1962(c) must be distinct from the "enterprise". *Board of County Com'rs v. Liberty Group,* 965 F.2d 879, 885 (10th Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 329, 121 L.Ed.2d 247 (1992) (citing *Garbade v. Great Divide Min. and Mill. Corp.,* 831 F.2d 212, 213 (10th Cir.1987)).[12] MNSP and BRMD are the only "persons" alleged to have conducted and/or participated in a pattern of racketeering activity who are distinct from the "enterprise". The plaintiffs' RICO claims against MSI, MRE, MPI, Fenstermacher, Hoagland, Rayl, HMF, Grieger and Kiser fail as a matter of law because these defendants are alleged to constitute the "enterprise" and are also the "persons" conducting the pattern of racketeering activity. Under § 1962(c), these "persons" cannot be employed by or associated with the "enterprise"—namely, themselves. *Board of County Com'rs,* 965 F.2d at 885; *Raymark Industries,* 714 F.Supp. at 472–73.

The defendants' motion for summary judgment on plaintiffs' RICO claim is granted.

### Non–RICO Claims

#### Statute of Limitations

The defendants argue the plaintiffs' non-RICO claims of fraud, negligent misrepresentation, and civil conspiracy are barred by the statute of limitations. The parties agree that the plaintiffs' lawsuit was filed on April 20, 1988, more than two years after the conduct forming the basis of plaintiffs' claims occurred. The parties also agree that all of plaintiffs' non-RICO claims are subject to K.S.A. 60–513(a)(3). (Doc. 371, p. 54) They dispute when the acts or conduct giving rise to plaintiffs' claims could have been discovered.

K.S.A. 60–513(a)(3) provides that an action for relief on the ground of fraud shall be brought within two years, but the cause of action does not accrue until the fraud is discovered. A fraud is deemed "discovered" when "the act giving rise to the cause of action causes substantial injury, or, if the fact of injury is not reasonably ascertainable until sometime after the initial act, then ... [when] the fact of injury becomes reasonably ascertainable to the injury party." K.S.A. 60–513(b). Therefore, a plaintiff is deemed to have discovered the fraud when he knew, or, with reasonable diligence, should have known of the acts or conduct giving rise to the conduct. *Schrag v. Dinges,* 788 F.Supp. 1543, 1549 (D.Kan.1992) (citing *Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 643 P.2d 100 (1982)).

The acts or conduct of which the plaintiffs complain are described in the pretrial order.[13] The plaintiffs allege the defendants engaged in a fraudulent scheme to sell NSA at an artificially high price by falsely inflating the occupancy levels of NSA by offering tenants rental concessions and not disclosing these concessions to the defendants; removing all references to rent concessions from the leases; providing false financial statements to the defendants; falsely representing that no cash move-in bonuses were given to tenants; and providing a Rent Roll that contained false statements concerning leases and rents currently being collected. (¶ 14, Pretrial Order)

The plaintiffs were clearly aware as of April 20, 1986, a point in time two years prior to the date suit was filed, of Monarch Properties, Inc.'s historical practice of granting tenants move-in bonuses. In response to an information request by Gleicher on Septem-

---

12. Eleven circuits have addressed this issue, and all but one have held that the "person" charged with the RICO violation must be distinct from the "enterprise" under § 1962(c). *Board of County Com'rs,* 965 F.2d at 885, n. 4.

13. The plaintiffs allege in ¶ 18 of the pretrial order that Kiser and Grieger represented to NSALP, Anchor, Pottinger and/or Gleicher that the Monarch Group was interested in managing NSA after the closing when, in fact, they had no intention of doing so. These representations, even if made, cannot be actionable. Gleicher and his assignees owned NSA after the closing. They could hire anyone they wanted to manage NSA, or even manage it themselves.

ber 4, 1985, Steven Kiser sent a letter on September 19, 1985, that disclosed Monarch Properties, Inc. had offered move-in bonuses at least as far back as January, 1984, and continued to offer them through August, 1985. It is also undisputed that the plaintiffs were aware that Linda Bruno, who was hired to manage NSA after the closing, continued to offer move-in bonuses and honor rent concessions after November 1, 1985. In a memo to Gleicher on November 8, 1985, Bruno discussed NSA's advertisement, which reflected a move-in bonus. She also discussed the use of rent coupons by NSA tenants from promotions earlier in the year. Additionally, on February 20, 1986, and again on March 21, 1986, Gleicher's representative asked Bruno to provide a list of persons using the rent coupons issued by MNSP. Bruno responded on April 7, 1986, with a list of rent concessions as of November 1, 1985. Gleicher received the list.

The plaintiffs concede the above facts, (Doc. 371, p. 62) but contend the existence of rent concessions and move-in bonuses was only a piece of an otherwise hidden scheme of fraud perpetrated upon them by the defendants. According to the plaintiffs, the defendants falsely stated in rent rolls provided to the plaintiffs on September 13, 1985, October 20, 1985, and October 30, 1985, that certain persons were residing at NSA when in fact those persons had either tendered notices to vacate or in fact had already vacated the premises.

The plaintiffs also allege the defendants failed to disclose certain move-in bonuses that plaintiffs refer to as the October Tenant Bonus Promotion. The plaintiffs allege that as part of this promotion, eighteen persons signed six-month leases at NSA in mid-October, 1985. The rent rolls provided by the defendants on October 20, 1985, identified these eighteen persons and indicated the tenants had prepaid their November rent. In fact, Monarch Properties, Inc. had paid move-in bonuses totalling $6,290 to these eighteen tenants. (Doc. 371 at 32) The parties dispute whether the plaintiffs were aware of the October Tenant Bonus Promotion prior to the closing. Fenstermacher testified he informed Gleicher of this promotion prior to the closing, but Gleicher denies any knowledge of the promotion.

The plaintiffs contend the statute of limitations was tolled until March, 1988, when the manager of NSA at the time, David Tinsman, found a rent receipt journal in the lower drawer of a filing cabinet in the leasing office of NSA. According to Tinsman, the lower drawer contained hanging green basket type files with various types of information letters the management would send to NSA tenants. Allegedly, the green folders visually concealed the rent receipt journal, which was laying flat on the bottom of the drawer, underneath the hanging files. The plaintiffs contend that they could not have had notice of the defendants' alleged fraud scheme before these file folder were found.

The plaintiffs had exclusive possession and control of NSA after November 1, 1985. They could easily have looked through the office and discovered any document. The file drawer whose contents the plaintiffs contend put them on inquiry notice as to fraud was neither locked nor otherwise inaccessible. However, the manager of the complex was Bruno, whom the plaintiffs allege was acting in furtherance of the fraudulent scheme. (¶ 25, Pretrial Order) It is uncontroverted that Bruno received a $10,000 bonus from Monarch Properties, Inc. prior to closing. This fact raises the inference, albeit a very weak one, of Bruno's complicity in the alleged fraud scheme which precluded the plaintiffs from discovering the fraud. Although the acts of an agent are generally imputed to the principal, *Conner v. Koch Oil Co.*, 245 Kan. 250, 254, 777 P.2d 821 (1989), an exception exists in cases of fraud. *See Supreme Petroleum, Inc. v. Briggs*, 199 Kan. 669, 675–76, 433 P.2d 373 (1967) (fraud of agent not imputed to principal unless agent is the sole representative of principal). Bearing in mind that the court must indulge the party opposing the motion in all reasonable inferences, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511, the court cannot say at this juncture that no genuine issue of material fact exists as to whether the fraud was discoverable prior to April 20, 1986.

The court finds a disputed issue of material fact exists over whether plaintiffs' non-RICO claims are barred by the statute of limitations.

### Fraud Claims

The defendants argue the plaintiffs cannot establish they reasonably relied on any of the misrepresentations the defendants allegedly made. They argue that Gleicher's lack of reliance is demonstrated by the fact that he formulated his own projections that were substantially more optimistic than the financial projections he received from Grieger. Gleicher's projections were then disseminated to prospective investors in NSALP.

■ In order to recover for fraud, a plaintiff must prove by clear and convincing evidence that he relied on a defendant's misrepresentations to his detriment, and such reliance was reasonable and justifiable. *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 467, 738 P.2d 1210 (1987). The fact that Gleicher put together his own financial projections does not, in and of itself, establish that he did not rely on the defendants' representations. These projections relate to how Gleicher believed NSA would perform in the future. A reasonable factfinder could believe that Gleicher relied on the defendants' representations to assess the viability of the investment. Furthermore, some aspects of the alleged fraud scheme were allegedly not disclosed. For instance, the plaintiffs contend they were unaware of the October Tenant Bonus Promotion at the time of closing. In these circumstances, the court believes a disputed issue of material fact exists as to whether the plaintiffs relied on the defendants' representations.

The defendants' motion for summary judgment on plaintiffs' fraud claim is denied.

### Negligent Misrepresentation

The defendants argue the negligent misrepresentation claim should be dismissed because such a cause of action is not recognized in Kansas unless it is expressly created by statute. (Doc. 333 at 81) The plaintiffs' authority for this proposition is *Johnson v. Geer Real Estate Co.*, 239 Kan. 324, 720 P.2d 660 (1986), wherein the court held that real estate brokers are subject to liability for negligent misrepresentation for failure to as-

certain and disclose material information that the broker should have known. The court's decision was based upon the provisions of the Real Estate Brokers' and Salespersons' License Act, K.S.A. 58–3034 *et seq.* In *dicta*, the court quoted from an article [14] in the Kansas Bar Journal, wherein it was stated that negligent misrepresentation " 'clearly is a right of action which is not available under Kansas common law.' " 239 Kan. at 331, 720 P.2d 660.

■ In *Comeau v. Rupp*, 762 F.Supp. 1434 (D.Kan.1991), the court addressed the same argument and although finding it unnecessary to decide the issue before it, expressed "considerable doubts" as to the validity of this argument. *Id.* at 1444. The court cited several Kansas cases recognizing a cause of action for negligent misrepresentation in the absence of statutory authority.

This court likewise has grave doubts as to the validity of the defendants' argument. The court finds the defendants' reliance on *Johnson* to be misplaced and holds that a claim for negligent misrepresentation is available under Kansas common law.

### Economic Loss

■ The defendants argue that the plaintiffs' negligent misrepresentation claim is improper because purely economic loss is not recoverable under a negligence theory. Under the Kansas comparative negligence statute, K.S.A. 60–258a, a party's contributory negligence does not bar that party from recovering damages *for negligence* resulting in death, personal injury, property damage *or economic loss.* The language of K.S.A. 60–258a clearly contemplates negligence claims seeking purely economic loss. The defendants correctly point out, however, that K.S.A. 60–258a was amended to specifically include claims for economic loss. This amendment became effective July 1, 1987. *Wichita Fed'l Savings & Loan Ass'n v. Black*, 245 Kan. 523, 543, 781 P.2d 707 (1989). The amendment does not apply to the case at bar because the plaintiffs' negligence claim accrued prior to the amendment. *See id.*

The question then becomes whether Kansas law recognizes a negligence claim for

---

**14.** Altenhofen, *Potential Liability of Real Estate Brokers and Salesmen for Misrepresentation and* *Nondisclosure in Kansas*, 52 J.Kan.Bar 9, 15–16 (1983).

purely economic loss prior to the amendment. Several cases have answered this question in the negative. *Green Construction Co. v. KPL,* 732 F.Supp. 1550, 1552, n. 2 (D.Kan.1990); *Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1217–18 (D.Kan.1986); *Owens–Corning Fiberglas v. Sonic Development Corp.,* 546 F.Supp. 533, 541–42 (D.Kan. 1982); *Broce–O'Dell Concrete Products, Inc. v. Mel Jarvis Constr. Co.,* 6 Kan.App.2d 757, 760, 634 P.2d 1142 (1981). This view is not, however, firmly established. *Cf. Federal Savings & Loan Ins. Corp. v. Huff,* 237 Kan. 873, 879, 704 P.2d 372 (1985) (court declines to hold that a claim seeking damages solely for economic loss can never be within the purview of K.S.A. 60–258a, but holds that an action seeking damages for economic loss to a savings and loan institution resulting from breach of fiduciary duty by its officers is beyond purview of K.S.A. 60–258a); *See generally* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 107, at 747 (5th ed. 1984).

The court hesitates to preclude the plaintiffs' claim in view of the equivocal attitude evinced by the Supreme Court concerning this question in *Huff.* While the court has considerable reservations about the viability of plaintiffs' theory, the court will permit the plaintiffs to proceed with their negligence claim at this time. Contributory negligence, of course, will bar recovery on this claim.

The defendants' motion for summary judgment on plaintiffs' negligent misrepresentation claim is denied.

*MNSP's Motion for Summary Judgment*

MNSP seeks summary judgment on the promissory note NSALP executed in its favor at closing. The court has addressed certain issues concerning the promissory note in a separate order adjudicating the plaintiffs' motion (Doc. 330) for partial summary judgment. In that order, the court has ruled that the partners of NSALP can be held personally liable for "all accounts receivable, security deposits, prepaid rents and expenses, and such other funds derived from the property that are the property of third parties, or that accrue from and after the occurrence of a default to the date holder obtains possession of the property."

The facts are uncontroverted that NSALP has not made the payments called for under the promissory note. However, the plaintiffs have alleged the promissory note was induced by a fraudulent scheme. If the plaintiffs can establish MNSP committed fraud in connection with the sale of NSA, the promissory note is subject to rescission. K.S.A. 84–3–202(b). The plaintiffs have raised the affirmative defense of rescission in the pretrial order.

MNSP's motion (Doc. 331) for summary judgment against Anchor Properties, Gleicher, and Pottinger in denied.

The defendants' Monarch Normandy Square Partners (MNSP), Al Fenstermacher, Richard Hoagland, Richard Rayl, BRMD, Monarch Properties, Inc., Monarch Real Estate Co., Inc., Monarch Securities, Inc., Steven C. Kiser, and William C. Grieger's motion for summary judgment (Doc. 331) is hereby granted as to the plaintiffs' RICO claims, but denied as to all other claims.

IT IS SO ORDERED.